Cándido Oliveras, Inc., demandante y recurrente, *v.* Universal Insurance Company, demandado y recurrido.

*Números:* RE-89-435 *Resueltos:* 7 de noviembre de 1996
 RE-89-439

*José M. Acevedo Álvarez*, abogado de la parte demandante y recurrente; *Alfonso Miranda Cárdenas*, de *Miranda Cárdenas & Córdova, Armando Martínez-Fernández*, y *Mario Arroyo Dávila*, de *Fiddler, González y Rodríguez*, abogados de la parte demandada y recurrida; *Manuel A. Santiago Tirado*, abogado del Negociado de Seguros Públicos y del Secretario de Hacienda; *Rafael G. Rocher Valera* y *José Luis González Castañer*, abogados de la Asociación de Compañías de Seguros de Puerto Rico, ambos en calidad de *amicii curiae*.

EL JUEZ ASOCIADO SEÑOR REBOLLO LÓPEZ emitió la opinión del Tribunal.

El 25 de febrero de 1976 la Universal Insurance Company (en adelante Universal), corporación doméstica que se dedica al negocio de seguros de propiedad y contingencia, otorgó un contrato con Cándido Oliveras, Inc. (en lo sucesivo Oliveras) conforme el cual éste actuaría como uno de sus agentes generales. Simultáneamente, se obtuvo de la Oficina del Comisionado de Seguros el nombramiento de Oliveras como agente general de Universal.

Dicho contrato *no* le concedía exclusividad a Oliveras, ya que Universal se reservó en el mismo el derecho de llevar a cabo negocios en Puerto Rico a través de otras fuentes.([1]) Se acordó que el contrato *podría ser cancelado*, por cualesquiera de las partes, previa notificación de treinta (30) días, salvo por "incumplimiento" de Oliveras, en cuyo caso dicha cancelación sería efectiva al momento de la notificación.([2])

---

([1]) A esos efectos, el referido contrato dispone:

" ... It is understood and agreed that the Company reserves its right to transact business in the territory through other sources." Caso Núm. RE-89-439, Apéndice 1, pág. 1.

([2]) A esos efectos, se dispuso en el contrato lo siguiente:

"It is further mutually agreed between the parties hereto that this Agreement shall continue in force indefinitely, but that the same may be terminated by either party giving the other thirty (30) days, written notice of a desire and intention to terminate it. If the Agent defaults in the performance of the Agent's obligations hereunder or creditors Company may, at its election, terminate this Agreement immediately without thirty (30) days notice to Agent...." Caso Núm. RE-89-4, Apéndice

Universal quedó obligada a pagar a Oliveras las comisiones acordadas en el contrato y una "comisión contingente" (*profit sharing commission*), la cual se pagaría anualmente a razón del diez por ciento (10%) de la ganancia neta anual proveniente de las pólizas que Oliveras suscribiera. El 30 de junio de 1977, las partes acordaron modificar las "comisiones contingentes" en aquellos casos provenientes de seguros de agencias gubernamentales; acordando, además, establecer una "comisión contingente adicional" a la ya pactada en los casos de los municipios. La comisión originalmente pactada era de ocho y medio por ciento (8 1/2%); se le añadió un uno y medio por ciento (1 1/2%).(³) La Universal también se obligó a designar ajustadores para el manejo de las reclamaciones sometidas contra las pólizas suscritas y, además, a pagar por las pérdidas.

Por su parte, Oliveras quedó obligado para con Universal a mantener vigentes las licencias requeridas por la Oficina del Comisionado de Seguros, a correr con los gastos operacionales y administrativos de su agencia y a rendir informes de las pérdidas incurridas. Además, mensualmente, Oliveras entregaría a Universal un informe detallado de las pólizas emitidas en el cual haría mención del nombre del asegurado, el tipo de cubierta, la prima pagada y la deducción a hacerse por concepto de la comisión que le correspondía a Oliveras. Oliveras también se obligó a cobrar y conservar, *en capacidad fiduciaria*, las primas a él pagadas hasta tanto las remitiera a Universal. Merece aclararse que era Oliveras quien recibía inicialmente los pagos por las primas vendidas y que de las mismas sólo podían deducirce las comisiones acordadas en el contrato.

En el desempeño de su función como agente general de Universal, Oliveras logró obtener pólizas de entidades gubernamentales y privadas que, *conforme al procedimiento*

---

1, pág. 4.

(³) Véase Apéndice 1, pág. 11, Oposición a que se Expida Auto de Revisión de Universal Insurance Company (en adelante Universal) en RE-89-439.

*gubernamental vigente*, se llevan a cabo mediante los procedimientos de subasta. Por esta razón, Oliveras comparecía a las mismas a nombre de Universal; en varias ocasiones, obtuvo la adjudicación de éstas.([4])

Para fines de 1977 y principios de 1978, Oliveras *dejó de remitir* a Universal las primas cobradas por los seguros gubernamentales dentro del período acordado.([5]) Además de la omisión de remitir las primas cobradas a Universal, Oliveras *tampoco* mantenía una cuenta bancaria separada para las operaciones del negocio y otra para depositar las primas que cobraba a nombre de Universal. Como consecuencia de esto, el 16 de mayo de 1978, Universal envió una carta al Negociado de Seguros Públicos —dependencia adscrita al Departamento de Hacienda— mediante la cual solicitaba el envío de los pagos por concepto de primas adeudadas, impidiendo así que los pagos fueran directamente recibidos por Oliveras.([6]) En dicha comunicación, Universal notificó a dicho negociado gubernamental su intención de acudir directamente a licitar en las subastas que se celebraran en el futuro.

Estas circunstancias crearon diferencias entre las partes y, finalmente, mediante Carta de 9 de octubre de 1978 Universal *canceló* el contrato con Oliveras. En esa misma fecha, Universal le notificó —mediante carta— al Comisio-

---

([4]) Pólizas obtenidas por Cándido Oliveras, Inc. (en adelante Oliveras) mediante su comparecencia a las subastas de pólizas gubernamentales que están en controversia:

1. Administración de Servicios Generales (Transporte) (Póliza Núm. A-3431) (Vigencia: junio 1976–1977).

2. Universidad de Puerto Rico (Póliza Núm. GLA-11989) (Vigencia: diciembre de 1976–1977).

3. Administración de Servicios Generales (Transporte) (Póliza Núm. GLA-12377) (Vigencia: junio 1977–1978).

4. Municipios de Puerto Rico (Póliza Núm. GLA-12376) (Vigencia: junio 1977–1978).

([5]) Debido a la dilación en el pago de las primas por parte del Gobierno, Universal concedió a Oliveras la facultad de remitir tales primas fuera del término estipulado de cincuenta (50) días, teniendo éste que remitirlas inmediatamente después de recibir el pago total o parcial.

([6]) La referida carta fue enviada con el visto bueno del presidente de Oliveras, Inc.

nado de Seguros (en adelante el Comisionado) que, *por consentimiento mutuo y efectivo a esa fecha*, se daba por terminado el contrato de agente general entre ésta y Oliveras. Ese mismo día, la Oficina del Comisionado de Seguros (en adelante la Oficina del Comisionado) canceló la licencia que Oliveras tenía para actuar como agente general de Universal.([7]) Desde el 9 de mayo de 1978 Universal compareció directamente a las subastas celebradas por el Negociado de Seguros Públicos,([8]) obteniendo la buena pro en varias de éstas para asegurar tanto a agencias gubernamentales como a municipios.([9])

---

([7]) La Oficina del Comisionado de Seguros (en adelante la Oficina del Comisionado) llevó a cabo una investigación de las operaciones de Oliveras, y mediante Resolución de 25 de junio de 1979 *se determinó que Oliveras estaba violando el Art. 9.380(2) del Código de Seguros de Puerto Rico, 26 L.P.R.A. sec. 938(2),* que dispone, en lo pertinente:

"Todos los fondos que representan primas o primas devueltas recibidas por un agente, agente general, gerente, corredor o solicitador se recibirán en *capacidad fiduciaria, no se mezclarán con otros fondos del tenedor de licencia ....*" (Énfasis suplido.)

Por dicha violación el Comisionado de Seguros le impuso a Oliveras el pago de una multa de dos mil quinientos dólares ($2,500). Posteriormente, el 8 de mayo de 1980, la Oficina del Comisionado dictó una orden efectiva el 22 de mayo de 1980, *mediante la cual se determinó la denegación y la no renovación futura de la licencia de agente a Oliveras.*

([8]) Por disposición estatutaria, todas las pólizas gubernamentales tienen que ser llevadas a subasta pública, excepto en aquellos casos en que se determine que el método de subastas no es el más apropiado para la mejor protección del interés público. Véase 26 L.P.R.A. sec. 1202(3). La oficina encargada de celebrar estas subastas es el Negociado de Seguros Públicos. Éste publica los pliegos de subasta para cada póliza y los circula entre las compañías aseguradoras y agentes generales.

([9]) De todas las primas obtenidas por Universal mediante subasta existen varias que están en controversia en el caso de autos, a saber:

1. Administración de Servicios Generales (Póliza Núm. GLA-15-01014) (Vigencia: 8/78–7/79).

2. Municipios de Puerto Rico (Póliza Núm. GLA-15-00762) (Vigencia: 6/78–6/79).

3. Municipios de Puerto Rico (Póliza Núm. GLA-15-00762–Extensión) (Vigencia: 6/79–7/79).

4. Estado Libre Asociado (Póliza Núm. GLA-1501375) (Vigencia: 4/79–4/80).

5. Administración de Servicios Generales (Póliza Núm. GLA-15-02459) (Vigencia: 6/80–6/81).

6. Estado Libre Asociado (Póliza Núm. GLA-15-02344) (Vigencia: 4/80–4/81).

7. Compañía de Desarrollo Industrial (Póliza Núm. GLA-15-01976) (Vigencia: 01/80–01/83).

8. Administración de Servicios Generales (Póliza Núm. GLA-15-03820) (Vigencia: 6/81–6/82).

El 17 de enero de 1979 Oliveras presentó demanda contra Universal. La misma, enmendada varias veces, contenía varias causas de acción, a saber: una de daños y perjuicios —alegadamente por cancelación del contrato arbitraria y unilateralmente por parte de Universal— y otra por cobro de dinero por la alegada falta de pago de las comisiones debidas a Oliveras. Además, Oliveras instó acción contra el Estado Libre Asociado y el Secretario de Hacienda, acciones que, posteriormente, fueron desestimadas por el tribunal de instancia. Universal, por su parte, luego de contestar la demanda negando las alegaciones fundamentales de la misma, radicó una reconvención contra Oliveras en la cual alegó que éste le debía aproximadamente setecientos mil dólares ($700,000) por concepto de primas cobradas y no remitidas.

Presentada la prueba de ambas partes, el tribunal de instancia dictó sentencia el 5 de julio de 1989, declarando *con* lugar la demanda radicada por Oliveras. Procede que se enfatice el hecho de que el foro de instancia determinó que el "Estado Libre Asociado de Puerto Rico era uno de los clientes principales de la demandante" (Caso Núm. RE-89-439, Apéndice 2, pág. 18) y que el Estado venía en la obligación de pagarle a Oliveras comisiones en relación con pólizas de seguros que Universal obtuvo, licitando directamente dicha Compañía en las subastas públicas llevadas a cabo por el Estado, luego de haberse cancelado el contrato de agencia entre las partes. En consecuencia, le impuso a Universal la obligación de pagarle a Oliveras la suma total de un millón noventa y tres mil ciento seis dólares con once centavos ($1,093,106.11) en comisiones;[10] el pago de

---

9. Municipios de Puerto Rico (Póliza Núm. GLA-15-03819) (Vigencia: 6/81–6/82).

10. Municipios de Puerto Rico (Póliza Núm. GLA-15-8842) (Vigencia: 6/83–6/84).

[10] Las comisiones se desglosan como a continuación:

1. $693,887.95 por concepto de las comisiones de las pólizas que Universal emitió a ciertas agencias gubernamentales luego de licitar directamente en subastas celebradas desde el 19 de mayo de 1978 hasta el 1983.

2. $211,954.14 por concepto de comisiones contingentes.

veinte mil dólares ($20,000) por concepto de honorarios de abogado, las costas, e interés al once y medio por ciento (11 1/2%) anual —desde la fecha de la sentencia— sobre todas las partidas adjudicadas.

Oliveras, mediante moción de reconsideración, solicitó al tribunal de instancia la concesión de intereses desde que surgió la causa de acción o, en la alternativa, desde la radicación de la demanda y no desde la fecha de la sentencia. Dicha solicitud fue resuelta por el foro de instancia, disponiendo el aumento, en la tasa de interés, del once y medio por ciento (11 1/2%) a doce y medio por ciento (12 1/2%) anual sobre la totalidad de las cuantías concedidas desde la fecha en que nació el derecho al cobro de las mismas, aumentando así la cuantía adjudicada originalmente a aproximadamente dos millones cuatrocientos mil dólares ($2,400,000).

Inconformes con lo resuelto, *ambas* partes recurrieron ante este Foro. Oliveras planteó que el tribunal de instancia erró al:

1) ... no conceder intereses sobre las sumas que condenó a la recurrida a pagar desde que se radicó la demanda.
2) ... no conceder los daños y perjuicios dispuestos en la ley de contratos de distribución.

Universal, por su parte, le imputó al foro de instancia haber errado al:

A. ...Concluir que el Estado Libre Asociado era uno de los clientes principales de Oliveras, pues tal conclusión no puede armonizarse con el esquema de política pública en que opera la adjudicación de pólizas de seguro del Gobierno.
B. ...disponer que Universal tiene que pagar a Oliveras la suma de $693,887.95 por comisiones de las pólizas que Universal emitió a ciertas agencias gubernamentales luego de licitar directamente en subastas celebradas entre el período comprendido del 19 de mayo de 1978 hasta el año 1983.
C. ...disponer que Universal tiene que pagarle a Oliveras la suma de $211,954.14 por concepto de comisiones contingentes.

---

3. $187,264.02 por comisiones correspondientes a las pólizas en las que Oliveras intervino directamente como agente general antes de la cancelación del contrato.

D. ...reconocerle derecho a Oliveras a cobrar la suma de $187,264.02 por ciertas comisiones de negocios llevados a cabo antes de mayo de 1978, cuando Oliveras debía a Universal una cantidad mayor proveniente de primas.

E. ...no resolver nada sobre la reconvención instada por Universal a pesar de que se desfiló prueba sobre la misma.

F. ...aplicar los principios generales sobre obligaciones y contratos en completa abstracción de la normativa especial que rige el caso de autos, a saber, el Código de Seguros y sus disposiciones de orden público.

G. ...imponerle a Universal el pago de $20,000.00 por concepto de honorarios de abogado. Caso Núm. RE-89-439, Solicitud de revisión, págs. 12–13.

Procede que se enfatice el hecho de que la Asociación de Compañías de Seguros de Puerto Rico (ACodeSe) y el Negociado de Seguros Públicos del Departamento de Hacienda solicitaron comparecer como *amicii curiae*, alegando que el caso de autos plantea asuntos sin precedentes que están revestidos de una importancia trascendental para la industria de seguros y para el Estado Libre Asociado.[11] Concedidas las solicitudes de intervención como *amicii curiae*, consolidamos los recursos radicados, y expedimos.

---

[11] Entre los asuntos traídos por la Asociación de Compañías de Seguros de Puerto Rico (ACodeSe) y el Negociado de Seguros Públicos del Departamento de Hacienda, se plantean como cuestiones nuevas:

(a) Si es conveniente y legal que un agente general o un agente pueda reclamar válidamente que el Gobierno es su cliente particular a base del argumento de que con sus gestiones lo desarrolló y conquistó, o si ello está reñido con el diseño de política pública plasmado en el Art. 12.020(3) del Código de Seguros de Puerto Rico, 26 L.P.R.A. sec. 1202(3), y el Reglamento Núm. 29 del Departamento de Hacienda, que recogen el marco en que opera la adjudicación de las pólizas de seguro por parte del Gobierno, sus instrumentalidades, dependencias y municipios.

(b) Si es conveniente y legal que las compañías de seguros vengan obligadas a pagar comisiones a los agentes que anteriormente las representaron en las subastas gubernamentales, cuando luego tales aseguradoras decidan comparecer directamente a dichas licitaciones y obtengan la adjudicación de los seguros de las mismas dependencias previamente aseguradas con esos agentes como intermediarios.

(c) Si es conveniente y legal que una compañía de seguros le tenga que pagar comisiones a una persona o entidad que no posee licencia de agente por no haberle sido renovada la misma por el Comisionado de Seguros, o si ello va contra lo dispuesto en el Art. 9.061(2) del Código de Seguros de Puerto Rico, 26 L.P.R.A. sec. 906a(2).

Estando en condiciones de resolver el recurso radicado, procedemos a así hacerlo.([12])

## I

*Discusión de errores planteados por Oliveras, Inc.*

Como *primer error*, Oliveras señala que el tribunal de instancia no le concedió los intereses sobre las cuantías otorgadas a éstos desde la radicación de la demanda. Resulta *académico* discutir dicho señalamiento ya que el tribunal de instancia concedió a Oliveras los intereses solicitados en el referido error.([13]) Nos limitamos, en consecuencia, en cuanto a Oliveras, a discutir el *segundo error* planteado por éste; esto es, la no aplicación al caso de autos de los remedios provistos por la Ley de Contratos de Distribución, Ley Núm. 75 de 24 de junio de 1964, según enmendada, 10 L.P.R.A. sec. 278 *et seq. Entendemos que dicho error no se cometió.* Veamos.

La Ley Núm. 75, ante, define la figura del "distribuidor" y el "contrato de distribución", en el Art. 1 (10 L.P.R.A. sec. 278(a) y (b)), de la manera siguiente:

> (a) *Distribuidor*: persona realmente interesada en un contrato de distribución por tener efectivamente a su cargo en Puerto Rico la distribución, agencia, concesión o representación de determinada mercancía o servicio.
> (b) *Contrato de distribución*: relación establecida entre un distribuidor y un principal o concedente, mediante la cual, e irrespectivamente de la forma en que las partes denominen, caractericen o formalicen dicha relación, el primero se hace real y efectivamente cargo de la distribución de una mercancía, o de

---

([12]) Debido a la consolidación de las solicitudes de revisión, discutiremos los errores de cada recurrente por separado. Aquellos señalamientos que giren en torno a cuestiones análogas serán discutidos conjuntamente.

([13]) El 8 de agosto de 1989, el tribunal de instancia emitió una resolución mediante la cual se aumentó la tasa de interés aplicable a la sentencia al doce y medio por ciento (12 1/2%) anual. En adición, resolvió que debido a la actuación temeraria de la parte demandada, se ordenaba el pago del interés legal (12 1/2% anual) sobre las cantidades concedidas en la sentencia desde que nació el derecho al cobro de aquéllas.

la prestación de un servicio mediante concesión o franquicia, en el mercado de Puerto Rico.

■ Este Tribunal ha expresado que

[l]a figura del distribuidor se identifica fundamentalmente por su gestión de crear un mercado favorable y conquistar una clientela para un producto o servicio mediante la promoción y conclusión de contratos de ventas. Su función comprende generalmente las actividades necesarias para la transferencia del fabricante al consumidor, o a algún punto intermedio .... La publicidad, la coordinación del mercado, las entregas de mercancía, los cobros, el mantenimiento de inventario y principalmente la promoción y conclusión de contratos de ventas son en términos generales obligaciones del distribuidor. *San Juan Merc. v. Canadian Transport Co.*, 108 D.P.R. 211, 215 (1978). Véase *J. Soler Motors v. Kaiser Jeep Int'l*, 108 D.P.R. 134, 142 (1978).

■ Nuestra jurisprudencia relativa a la Ley Núm. 75, ante —también conocida como Ley de Contratos de Distribución— ha establecido que los contratos de distribución, por su naturaleza, *son de carácter mercantil*. Véase *Pacheco v. Nat'l Western Life Ins. Co.*, 122 D.P.R. 55, 60 (1988). En el caso *Córdova & Simonpietri v. Crown American*, 112 D.P.R. 797, 803 (1982), acogimos la norma de que la relación entre los agentes de seguros y las aseguradoras "en tanto en cuanto *promuev*[a] *y concluy*[a] *contratos de seguro*" (énfasis suplido), está cubierta por la Ley Núm. 75, ante, *ya que dicha actividad se considera como mercantil*.

■ Señalamos, en *San Juan Merc. v. Canadian Transport Co.*, ante, pág. 215, que la Ley Núm. 75, ante, protege no sólo a los que distribuyen mercancía *sino también a aquellos que prestan un servicio al principal*. En cuanto a la actividad de los agentes de seguros, hemos manifestado que ésta "constituye la prestación de un servicio mediante concesión o franquicia en el mercado de Puerto Rico bajo la Ley de Contratos de Distribución", ya que la gestión fundamental de los agentes es la de vender y promover pólizas de seguros para beneficio de la aseguradora.

*Córdova & Simonpietri v. Crown American*, ante, pág. 803.[14]

La Ley Núm. 75, en su Art. 2 (10 L.P.R.A. sec. 278a), regula la *terminación* de contratos de distribución. El mismo dispone:

No empece la existencia en un contrato de distribución de

[14] En *Roberco, Inc. y Colón v. Oxford Inds., Inc.*, 122 D.P.R. 115, 131–132 (1988), establecimos unos factores para ser considerados al determinar cuándo se trata de un "distribuidor"; éstos son: "si el 'distribuidor' realiza una activa promoción y/o conclusión de contratos; si adquiere inventario; si ejerce control sobre los precios; si tiene discreción en cuanto a pactar los términos de las ventas; si tiene responsabilidad por la entrega y cobro de la mercancía, y autoridad para conceder crédito; si lleva a cabo gestiones, independientes o conjuntas, de publicidad; si ha asumido el riesgo y responsabilidad en la gestión que realiza; si compra el producto, y si tiene facilidades físicas y ofrece servicios relacionados con el producto a sus clientes. A éstos pueden añadírsele otros sin que se entienda ni pretenda hacer un listado exhaustivo". Aclaramos, en *Cobos Liccia v. DeJean Packing Co., Inc.*, 124 D.P.R. 896, 907 (1989), que "no tienen que estar presentes todos, para poder determinar si el demandante es un distribuidor ... debemos considerar estos criterios a la luz de la prueba vertida ante el tribunal de instancia".

Procede que se enfatice el hecho de que la Ley Núm. 21 de 5 de diciembre de 1990 (10 L.P.R.A. sec. 279 *et seq.*) revocó legislativamente los casos *Roberco, Inc. y Colón v. Oxford Inds., Inc.*, ante, y *Cobos Liccia v. DeJean, Packing Co., Inc.*, ante, en el sentido de que los representantes de ventas no son distribuidores protegidos por la Ley Núm. 75, ante. Dicha legislación amplió a los representantes de ventas las protecciones que la Ley Núm. 75, ante, le reconoce a los distribuidores. *Sin embargo, la definición de distrubuidor discutida en ambos casos continúa vigente.*

*Analizamos las actividades de Oliveras, a la luz de lo antes expresado.* No hay duda que Oliveras, como agente de Universal, promovía y suscribía contratos de seguros. Para lograrlo, visitaba clientes o prospectos a los que le sometía cotizaciones —*de acuerdo a los precios y términos establecidos por Universal*— y vendía los seguros propuestos, contrataba con el asegurado, emitía la póliza y cobraba la prima. Además, Oliveras mantenía facilidades físicas independientes de la principal y tenía personal bajo su supervisión, el cual fue adiestrado como agentes de seguros. Oliveras contaba con una cartera de seguros y generó para Universal una clientela significativa. Oliveras, además, tenía la responsabilidad de cobrar y conservar —en capacidad fiduciaria— las cantidades a él pagadas en concepto de las primas ya emitidas.

Ello no obstante, un examen de los autos demuestra que no era necesario que Oliveras mantuviera "inventario" alguno; éste no ejercía control sobre los "precios"; no tenía discreción en cuanto a los "términos" de las ventas; no realizaba gestiones de "publicidad"; no tenía autoridad para conceder "crédito", y no asumía "riesgo" alguno. *Roberco, Inc. y Colón v. Oxford Inds., Inc.*, ante.

Si a lo anteriormente señalado, *le añadimos el hecho de que en el contrato originalmente otorgado entre las partes se pactó que Universal expresamente se reservó el derecho de llevar a cabo negocios a través de otras fuentes y el hecho de que, de la prueba presentada, surge que Oliveras representaba a otras compañías aseguradoras* —actuaba como agente de Puerto Rican American Insurance Co. (PRAICo), Manufactorer's Trust Insurance Co. y American International Insurance Co.— *forzosa parece ser la conclusión de que la relación contractual establecida entre Universal y Oliveras no está "protegida" por las disposiciones de la referida Ley Núm. 75.*

una cláusula reservándole[s] a las partes el derecho a poner fin a la relación existente, ningún principal o concedente podrá dar por terminada dicha relación, o directa o indirectamente realizar acto alguno en menoscabo de la relación establecida, o negarse a renovar dicho contrato a su vencimiento normal, *excepto por justa causa*. 10 L.P.R.A. sec. 278a.

■ En cuanto a los posibles *daños* ocasionados por la terminación de un contrato de distribución, la Ley Núm. 75, ante, crea una causa de acción a favor del distribuidor en aquellos casos en los que el principal dé por terminado el contrato *sin* justa causa. *Marina Ind., Inc. v. Brown Boveri Corp.*, 114 D.P.R. 64, 77 (1983). En relación con los daños, el Art. 3 dispone, en lo pertinente, que:

De no existir justa causa para la terminación del contrato de distribución, para el menoscabo de la relación establecida, o para la negativa a renovar dicho contrato, el principal habrá ejecutado un acto torticero contra el distribuidor y deberá indemnizarle en la medida de los daños que le cause, cuya cuantía se fijará a base de los siguientes factores. 10 L.P.R.A. sec. 278b.

■ Para poder invocar el remedio de indemnización por la terminación arbitraria del contrato, es necesario demostrar la creación de un mercado y la adquisición de una clientela. *San Juan Merc. v. Canadian Transport Co.*, ante, págs. 215–216.([15]) Dicha acción es torticera y, como tal, es

---

([15]) Garrigues establece con relación a la indemnización lo siguiente:

"Para comprender esta justificación es necesario puntualizar el sentido que tiene en nuestro caso la indemnización. No se trata de una indemnización por incumplimiento contractual, la cual seguiría las normas propias del incumplimiento contractual. Tampoco se trata de una indemnización de carácter social inspirada en el deseo de proteger al trabajador como parte económicamente débil. Se trata más bien de una compensación de servicios realmente prestados por el agente. En efecto, la actividad del agente durante el contrato tiene generalmente como resultado la conquista de nuevos clientes. Pero esta nueva clientela es tanto del agente como del representado y en este sentido constituye un elemento del activo tanto de la empresa del uno como de la empresa del otro. Esto se ve claro cuando se extingue el contrato de agencia. En tal momento puede ocurrir una de estas dos cosas: o bien que los clientes permanezcan con el empresario representado perdiéndolos el agente; o bien que continúen vinculados al agente, el cual seguirá vendiéndoles, o bien por cuenta propia, o bien por cuenta de un nuevo empresario. Si ocurre lo primero, parece justo conceder al agente una indemnización que le compense de la pérdida del premio sobre las operaciones con una clientela que fue conquistada por él. En tal carácter se parece mucho esta compensación a la que reciben los agentes de seguros por el

necesario probar los daños sufridos. Reiteradamente hemos expresado, que en toda acción de este tipo, el peso de probar los daños recae en quien lo alega. *Zambrana v. Hospital Santo Asilo de Damas*, 109 D.P.R. 517, 521 (1980); *Marina Ind., Inc. v. Brown Boveri Corp.*, ante, pág. 90.

Aun asumiendo, a los fines de la argumentación, que la relación contractual existente entre Universal y Oliveras estuviera protegida por la citada Ley Núm. 75, somos del criterio que *no* procede la concesión de daños a Oliveras; *ello por razón de que entendemos que Universal tenía "justa causa" para cancelar el contrato existente.* Veamos.

El término "justa causa" es definido por la Ley Núm. 75 en su Art. 1(d), 10 L.P.R.A. sec. 278(d), de la siguiente manera:

> (d) *Justa causa*: incumplimiento de alguna de las obligaciones esenciales del contrato de distribución, por parte del distribuidor, o cualquier acción u omisión por parte de éste que afecte adversamente y en forma sustancial los intereses del principal o concedente en el desarrollo del mercado o distribución de la mercancía o servicios.

Esta definición de "justa causa" se refiere sólo a las actuaciones imputables al distribuidor. "Las vicisitudes y circunstancias del principal no juegan ningún papel en la ruptura de la relación contractual." *Medina & Medina v. Country Pride Foods*, 122 D.P.R. 172, 186 (1988).

En el sentido literal del estatuto, la terminación del contrato de distribución puede deberse básicamente a dos (2) tipos de conducta: el incumplimiento por parte del distribuidor de alguna de las obligaciones esenciales del contrato, o cualquier acto u omisión —del distribuidor— que afecte adversa o substancialmente el interés del principal en promover el mercado o la distribución.[16] La Ley

---

llamado "valor de cartera". J. Garrigues y Díaz Cañabate, *Tratado de Derecho Mercantil*, Madrid, Ed. Rev. Der. Mercantil, 1963, T. III, Vol. 1, pág. 576.

[16] C. Rodríguez Vidal, *The Concept of Just Cause for the Lawful Termination of a Dealership Under the Dealers' Contracts Law of Puerto Rico*, 58 Rev. Jur. U.P.R. 261, 266 (1989).

Núm. 75, ante, no establece otras situaciones —aparte de las dos (2) discutidas anteriormente— mediante las cuales el principal pueda aducir motivos para la terminación del contrato. Sin embargo, la Legislatura de Puerto Rico deliberadamente dejó flexible la definición de "justa causa" para que sea utilizada exclusivamente en las nuevas situaciones que surjan, de acuerdo a cada circunstancia.[17]

A manera de ejemplo, en *Medina & Medina v. Country Pride*, ante, págs. 190–191, este Tribunal expresó que el retiro total de un principal del mercado de Puerto Rico constituía "justa causa" para dar por terminada la relación. Sin embargo, condicionó dicha situación a "que la denuncia del contrato se haga de buena fe, en tiempo oportuno, con un plazo de preaviso de acuerdo con la naturaleza de la concesión y las características de la empresa concesionaria".[18]

En el caso de autos, como expresáramos anteriormente, parte de las obligaciones contractuales de Oliveras con Universal consistía en cobrar las primas y retenerlas en capacidad fiduciaria, y luego remitirlas a Universal, una vez hubiese descontando de éstas la comisión correspondiente. Oliveras a fines de 1977 y principios de 1978, dejó de remitir las primas según lo convenido, provocando que Universal solicitara al Negociado de Seguros Públicos el envío directo de los pagos por concepto de primas y la participación directa de Universal en las subastas gubernamentales, *todo esto con el visto bueno de Oliveras.* Posteriormente, una investigación de la Oficina del Comisionado confirmó otra de las causas alegadas por Universal; a saber, que Oliveras, *en violación al Código de Seguros de Puerto Rico,*[19] "mezcló" las cuantías cobradas por él

---

[17] P. Salamone, *Puerto Rico's Distributor's Law: Law 75: a Primer,* 18 Rev. Jur. U.I.A. 67, 103 (1983).

[18] T. Puente Muñoz, *El Contrato de Concesión Mercantil,* Madrid, Ed. Montecorvo, 1976, pág. 173.

[19] La Sec. 9.380(2) del Código de Seguros de Puerto Rico, ante, dispone, en lo pertinente:

a nombre de Universal —por concepto de primas adeudadas— con los fondos de operación de su negocio.

Respecto al "aviso" que Universal le dio a Oliveras sobre la cancelación del contrato, tenemos que en el caso de autos, el 16 de mayo de 1978 Universal envió una carta dirigida al Negociado de Subastas Públicas *con el consentimiento de Oliveras.* En ésta se le requirió al Negociado de Seguros el envío de los pagos por primas adeudadas directamente a Universal. En esa misma carta se le notificó al citado negociado administrativo la intención de Universal de comparecer directamente a las subastas. Casi cinco (5) meses después de la referida carta, Universal —al no poder resolver las asperezas con Oliveras— canceló el contrato mediante carta de 9 de octubre de 1978. Ante este cuadro fáctico, forzoso es concluir que los actos de Universal —al haber retirado a Oliveras de participar en las subastas y de evitar que fuera él quien recibiera los pagos de las primas directamente— manifestaban una clara y anticipada advertencia de la insatisfacción y disgusto por las actuaciones de Oliveras, todo en detrimento de la relación previamente establecida.

La conducta de Oliveras, además de constituir un incumplimiento de contrato con Universal, *contravino la legislación vigente que regula la industria de seguros en Puerto Rico.* Como expresáramos anteriormente, Oliveras "mezcló" el dinero cobrado por concepto de primas con el dinero que utilizaba en sus operaciones. Ello está expresamente prohibido por la antes transcrita Sec. 938(2) del Código de Seguros de Puerto Rico, ante. Somos del criterio que, en el caso de autos, el principal tenía razones justificadas o "justa causa" para dar por terminado el contrato de distribución. Al haber incumplido Oliveras con una de las obligaciones esenciales del contrato —como lo es el reembolso de los pagos por primas debidas— éste dio a Univer-

---

"Todos los fondos que representan primas o primas devueltas recibidas por un agente, agente general, gerente, corredor o solicitador se recibirán en *capacidad fiduciaria, no se mezclarán con otros fondos del tenedor de licencia* y se acreditarán y pagarán en su totalidad a la persona con derecho a ello."

sal justa causa para terminar el contrato. En conclusión, *por existir el elemento de justa causa, resulta totalmente improcedente la alegación de Oliveras de que se le debe de indemnizar por los daños causados por la terminación del contrato.*

## II

*Discusión de los errores planteados por Universal*

A. Resulta imperativo, en primer lugar, establecer el "derecho" bajo el cual realizamos el análisis de los errores alegados por Universal. Vale la pena aclarar que el tribunal de instancia, al hacer sus determinaciones de derecho, obvió las disposiciones del Código de Seguros de Puerto Rico aplicables al caso de autos, sólo empleando en su análisis los principios generales de las obligaciones y los contratos.

Como mencionamos anteriormente, la relación entre los agentes de seguros y las aseguradoras es de carácter mercantil. *Córdova & Simonpietri v. Crown American,* ante, pág. 803. Partiendo de esta premisa, tenemos que determinar las fuentes de derecho a ser aplicadas al analizar una actividad mercantil como la planteada en el caso ante nuestra consideración.

Primeramente, el Art. 2 del Código de Comercio, 10 L.P.R.A. sec. 1002, dispone que:

> Los actos de comercio, sean o no comerciantes los que los ejecuten, y estén o no especificados en este Código, se regirán por las disposiciones contenidas en él; y en su defecto, por los usos del comercio observados generalmente en cada plaza, y a falta de ambas reglas, por las del derecho común.
>
> Serán reputados actos de comercio los comprendidos en este Código, y cualesquiera otros de naturaleza análoga.

Este Tribunal, en el caso de *Julsrud v. Peche de P.R., Inc.,* 115 D.P.R. 18, 21 (1983), expresó que al analizar contratos mercantiles debemos atenernos, primeramente, a lo dispuesto en el Código de Comercio *o en leyes especia-*

*les* y, en ausencia de disposiciones relacionadas con éstas, debemos referirnos a las del Código Civil. Por otro lado, el Art. 81 del Código de Comercio dispone que:

Los contratos mercantiles, en todo lo relativo a sus requisitos, modificaciones, excepciones, interpretación y extinción y a la capacidad de los contratantes, se regirán, en todo lo que no se halle expresamente establecido en este Código o en leyes especiales, por las reglas generales del derecho común. 10 L.P.R.A. sec. 1301.

Tratándose el caso de autos de cuestiones relacionadas con la industria de seguros, es necesaria la aplicación de la legislación y reglamentación vigente que regula dicha materia, a saber, el Código de Seguros de Puerto Rico y su Reglamento. En el caso de *Mun. of San Juan v. Great Ame. Ins. Co.*, 117 D.P.R. 632, 635 (1986), expresamos que "[e]n el campo de los seguros hemos resuelto que su normativa especial emana del Código de Seguros, Ley Núm. 77 de 19 de junio de 1957 (26 L.P.R.A. sec. 101 *et seq.*), en tanto que el Código Civil le sirve como derecho supletorio".[20] Además, sabido es que "[c]uando los contratantes pactan sobre una materia regulada por ley, las disposiciones estatutarias se entienden incorporadas desde un principio al contrato". *E.L.A. v. Great Amer. Ins. Co.*, 106 D.P.R. 825, 829 (1978). Véase *Mora Dev. Corp. v. Sandín*, 118 D.P.R. 733, 751 (1987). El mismo Código de Seguros de Puerto Rico establece en el Art. 1.060 (26 L.P.R.A. sec. 106) que:

*Ninguna persona se dedicará en Puerto Rico al negocio de seguros* o relativo a persona o cosa asegurable que resida, esté situada o haya de realizarse en Puerto Rico, *sin cumplir con las disposiciones aplicables [de] este [código]*. (Énfasis suplido.)

Atendido lo anteriormente expuesto, somos del criterio de que en el caso de autos el tribunal de instancia incidió al limitar el análisis de las cuestiones planteadas al incum-

---

[20] La mencionada Ley Núm. 77, derogó los artículos que regulaban la industria de seguros en el Código de Comercio.

plimiento contractual según lo regulado por el Código Civil. Entendemos que era necesario que el análisis se hiciera a la luz de las disposiciones del Código de Comercio y del Código Seguros de Puerto Rico y su Reglamento.

B. Entre los errores planteados por Universal *surgen asuntos de interés tanto para la industria de seguros en Puerto Rico como para el Estado Libre Asociado, sus dependencias e instrumentalidades.* La Asociación de Compañías de Seguros de Puerto Rico, el Negociado de Seguros Públicos del Departamento de Hacienda y el Secretario del Departamento de Hacienda presentaron ante este Foro sus respectivas posiciones en cuanto a la determinación del foro de instancia de que el Estado Libre Asociado, y algunas de sus agencias o instrumentalidades, eran clientes particulares o clientes desarrollados y conquistados por Oliveras, Inc. y que, por lo tanto, Universal viene en la obligación de pagarle a dicho agente las comisiones de las pólizas vendidas por ésta a ciertas agencias gubernamentales, aún después de haber terminado el contrato y a pesar de haber sido Universal la que participara directamente en las subastas. Somos del criterio que el tribunal de instancia *erró* al tomar tal determinación ya que dicha conclusión es incompatible con el procedimiento establecido por ley para la adjudicación de las pólizas de seguros del Gobierno.

En Puerto Rico el procedimiento establecido para la contratación de seguros del Estado Libre Asociado de Puerto Rico —incluso todas sus instrumentalidades, dependencias y municipios— dimana del Art. 12.020(3) del Código de Seguros de Puerto Rico (26 L.P.R.A. sec. 1202(3)) y del Reglamento de Seguros, 26 L.P.R.A. secs. 204-1501 a 204-1506, y 204-6451 a 204-6468, edición especial. El Art. 12.020(3) del Código de Seguros de Puerto Rico, ante, señala que:

(3) Seguros que cubran los riesgos del Estado Libre Asociado de Puerto Rico, sus dependencias, entidades, corporaciones, autoridades y municipios. Con relación a estos seguros el Comisionado dictará reglas y reglamentos para establecer las condiciones y obligaciones que mejor protejan al interés público y

que garanticen asimismo un trato justo y razonable al asegurador, debiendo incluir en éstas una regla para que todo asegurador o agente general que cubra riesgos del Estado Libre Asociado venga obligado a someter, dentro de los noventa (90) días siguientes a la terminación del año natural, una relación detallada de las pérdidas pagadas y reclamaciones pendientes contra la póliza o pólizas de seguro contratadas. Por medio de estas reglas y reglamentos el Comisionado podrá autorizar, cuando lo crea necesario o conveniente, que se coticen primas diferentes a las que aparecen fijadas en el Manual de Tarifas.

Excepto en aquellos casos en que por ley se disponga de otro modo, *el Secretario de Hacienda gestionará y contratará los seguros del Estado Libre Asociado y sus municipios. También gestionará y contratará los seguros de las corporaciones y autoridades públicas del Estado Libre Asociado*, pero el Gobernador podrá permitir a tod[a]s y cualesquiera de dichas corporaciones y autoridades públicas que gestionen y contraten directamente cualquier seguro en aquellos casos en que surjan razones o circunstancias especiales que así lo requieran, previa recomendación al efecto del Comisionado después que este funcionario haya examinado detalladamente todos los fundamentos que se aducen para justificar tal solicitud y los criterios y formalidades que han prevalecido en situaciones similares anteriores. *En la contratación de los seguros arriba expresados se utilizará el procedimiento de subasta*, excepto en aquellos casos en que se determine que el método de subasta no es el más apropiado para la mejor protección del interés público. (Énfasis suplido.)[21]

El citado Art. 12.020(3) faculta al Secretario de Hacienda para gestionar y contratar los seguros del Estado Libre Asociado, sus municipios y corporaciones públicas, excepto en los casos en que por ley se disponga otro modo o que el Gobernador así lo determine, siempre y cuando surjan razones o circunstancias especiales que lo ameriten.[22]

---

[21] Con relación al Art. 12.020(3) del Código de Seguros de Puerto Rico, 26 L.P.R.A. sec. 12.020(3), la Asamblea Legislativa dispuso, en lo pertinente, que: "El propósito de esta enmienda es autorizar al Comisionado de Seguros a que, con relación a los seguros del Estado Libre Asociado, sus dependencias, entidades, corporaciones, autoridades y municipios puedan dictar reglas y reglamentos para establecer las condiciones que mejor protejan el interés público y que garanticen al mismo tiempo un trato justo y razonable al asegurador." 9 Diario de Sesiones de la Asamblea Legislativa (Ordinaria), T. 3, pág. 1420 (1957).

[22] En *Commonwealth Ins. Co. v. Casellas*, 103 D.P.R. 539, 543–544 (1975), expresamos con respecto a la contratación con aseguradores no autorizados que: "Nuestro Código autoriza expresamente al Secretario de Hacienda a establecer las condiciones que mejor garanticen el interés público. Puede protegerse el interés general de modo adecuado al mismo tiempo que se autoriza reducir el costo al erario

Además, el Código de Seguros de Puerto Rico autoriza al Comisionado a establecer las reglas y reglamentos, de modo que se garantice el interés público en la contratación por subasta de los seguros públicos.[23]

Por su parte, el Reglamento establece, en su Sec. 204-1503, la *política pública* mediante la cual se intenta garantizar al Gobierno tarifas más bajas, ya que "[l]os aseguradores o sus agentes generales cotizarán para los contratos de seguros del estado aquellos tipos que sean los más justos y equitativos tomando en consideración la cuantía del riesgo y los costos razonables de administración y producción". 26 L.P.R.A. sec. 204-1503, edición especial.

Dicho Reglamento también regula, en la sec. 204-6451 *et seq.*, 26 L.P.R.A. sec. 204-6451 *et seq.*, edición especial, de forma detallada todo el proceso de contratación de las fianzas y los seguros —que cubren los riesgos del Estado Libre Asociado y sus dependencias, entidades corporativas y municipios— y las reclamaciones y pagos de acuerdo con las referidas fianzas y seguros. El Reglamento en cuestión aplica a todo asegurador autorizado por el Comisionado para contratar seguros en Puerto Rico, sus agentes o agentes generales.[24] El Reglamento regula materias tales como las cotizaciones, Junta de Subastas, los licitadores, convocatoria a subastas, rechazo de proposiciones, Junta de Apelaciones e impugnación de la validez de la convocatoria, licitación y/o adjudicación de la subasta. De este modo, se ha establecido un esquema de subasta mediante el cual se le brinda al Gobierno la flexibilidad de obtener los seguros necesarios y, además, se garantiza la participación y libre competencia de todos los licitadores que así cualifiquen. Dicha reglamentación, mediante el mecanismo de subasta, tiene como finalidad abaratar los costos de los

---

público [sic] de los seguros que necesita. En ausencia de una expresión legislativa específica de que el Estado Libre Asociado no debe gozar de esta valiosa flexibilidad no vemos motivo para alterar la práctica administrativa al respecto."

[23] Art. 2.040 (26 L.P.R.A. sec. 204).

[24] 26 L.P.R.A. sec. 204-6451, edición especial.

seguros y permitir la participación directa de los licitadores, sin la intervención de intermediarios.([25])

*El Reglamento, en la Sec. 204-6454(a), establece un procedimiento de subasta formal cuando la prima excede los cinco mil dólares ($5,000).* A tales efectos se les envía a todos los licitadores que forman parte del Registro de Licitadores un pliego de subasta.([26]) Dichos pliegos son publicados antes de cada subasta y varían año tras año. *De este modo se garantiza un proceso de subasta único e independiente en el que impera la libre competencia y se evita que la información contenida en éstos haya sido obtenida por el asegurador al que se le adjudicó la subasta previamente.* El procedimiento de subastas utilizado por el Gobierno es de suma importancia para el *interés público* ya que mediante éstas se adjudican los contratos de seguros del Estado Libre Asociado al mejor postor que cumpla con los requisitos del Reglamento y con los términos establecidos en el pliego de subasta.

Aquellos licitadores, que cumplan con los requisitos que establece el Reglamento, y sometan ofertas de acuerdo a las exigencias del pliego de subasta, tendrán derecho a participar en el "negocio de seguro público". En el Negociado de Seguros Públicos se mantiene un registro que incluye a todos aquellos aseguradores interesados en licitar; aquellos que no aparezcan en dicho registro, lo harán cons-

---

([25]) A esos efectos, en el Informe del Subcomité Especial del Senado para el estudio del P. de la C. 85, que posteriormente se convirtió en el Código de Seguros de Puerto Rico se expresó que:

"Esta enmienda es deseable a los fines de que el Estado Libre Asociado de Puerto Rico, que indudablemente hace inversiones muy sustanciales en seguros, *pueda colocar sus riesgos directamente con las compañías aseguradoras* y pueda, asimismo, estar en relación con las primas aplicables, fuera de la tabla de tarifas que se adopte por el Comisionado para el negocio de seguros en Puerto Rico. Indudablemente, *esta enmienda habrá de traer consigo una economía substancial en la inversión que, por concepto de seguros, hace el Estado Libre Asociado, sus agencias, instrumentalidades, corporaciones y municipios.*" (Énfasis suplido.) Diario de Sesiones (Ordinaria), ante, pág. 1420.

([26]) La Sec. 204-6453(s) del Reglamento define el "pliego de subasta" como "el grupo de documentos que se entregarán a los licitadores interesados en cotizar en los cuales se establecen las condiciones necesarias para facilitarle a éstos sus ofertas". 26 L.P.R.A. sec. 204-6453(s), edición especial.

tar por escrito para que sus nombres queden incluidos. Sec. 204-6456(a) del Reglamento, 26 L.P.R.A. sec. 204-6456, edición especial.

Por su parte, la Sec. 204-6457(a) del Reglamento, 26 L.P.R.A. sec. 204-6457(a), edición especial, regula el *proceso de convocatoria* a las subastas. Mediante éste, se faculta al Negociado de Seguros Públicos para que invite a todas las aseguradoras (incluidas en el Registro de Licitadores) a que sometan las cotizaciones de acuerdo a lo establecido en el pliego de subastas. Toda convocatoria contiene una descripción de los riesgos asegurables, los límites deseados, la experiencia previa del seguro, los términos y las condiciones que rijan la transacción. 26 L.P.R.A. sec. 204-6457(d)(2), edición especial. Por otro lado, el Reglamento establece las especificaciones que contendrá una convocatoria en aquellos casos en que no se incluya el pliego de subasta. Una vez finaliza el proceso de radicación de ofertas y la celebración de la subasta pública, "se adjudicará al licitador que hubiere ofrecido la cotización más adecuada y razonable ajustándose a las especificaciones, términos y condiciones contenidas en la invitación a subasta". 26 L.P.R.A. sec. 204-6460(a), edición especial.

En resumen, el proceso de subasta se inicia con una convocatoria a los licitadores y culmina con la adjudicación del contrato de seguro. Este proceso persigue la obtención de menores costos y mayor eficiencia en los servicios; a esos efectos, el mismo se lleva a cabo periódicamente y de forma pública. *Resulta ser una práctica establecida que cada subasta sea un acto individual y que los licitadores estén todos en igualdad de condiciones, incluso aquel que obtuvo la buena pro en la subasta anterior.*

Con relación a dicho esquema de subasta,[27] en

___

[27] Hace más de medio siglo este Tribunal señaló en *Santana v. Manatí*, 33 D.P.R. 43, 49 (1924), lo siguiente:

"... El espíritu y fin del precepto legal de que toda obra pública se realice 'mediante proposiciones' [o subasta] es garantizar la mayor competencia posible entre

aquellos procedimientos de compra de bienes y *servicios* por parte del Gobierno, expresamos hace más de veinte (20) años en *Justiniano v. E.L.A.*, 100 D.P.R. 334, 338 (1971), que:

El propósito que persiguen los estatutos de esta naturaleza que requieren la celebración de subasta es que haya competencia en las proposiciones *de manera que el Estado consiga que se realice la obra al precio más bajo posible. Además, al requerirse que la subasta y el contrato se adjudiquen al postor más bajo, se evita que haya favoritismo, corrupción, extravagancia y descuido al otorgarse los contratos.* (Énfasis suplido y escolio omitido.)

Recientemente, en *Mar-Mol Co., Inc. v. Adm. Servicios Gens.*, 126 D.P.R. 864, 871 (1990), reiteramos que

[l]a buena administración de un gobierno es una virtud de democracia, y parte de una buena administración implica llevar a cabo sus funciones como comprador con eficiencia, honestidad y corrección para proteger los intereses y dineros del pueblo al cual dicho gobierno representa.

Los propósitos de la legislación que regula la realización de obras y la contratación de servicios para el Gobierno y los sistemas de subastas gubernamentales son precisamente ésos: proteger los intereses y dineros del pueblo al promover la competencia para lograr los precios más bajos posibles; evitar el favoritismo, la corrupción, el dispendio, la prevaricación, la extravagancia y el descuido al otorgarse los contratos, y minimizar los riesgos de incumplimiento.

■ Es correcto que reiteradamente hemos resuelto que, de ordinario, este Tribunal no intervendrá con las determinaciones de hecho y la adjudicación de credibilidad hecha por los tribunales de instancia, a menos que existan circunstancias extraordinarias, error manifiesto, pasión,

---

los licitadores, y como resultado de esto la mayor ventaja y el mejor contrato que pueda obtenerse para el municipio [o entidad pública], no para algún hijo favorito o protegido político, a costa de los contribuyentes y con exclusión de los contratistas que son igualmente competentes y responsables, que estarían dispuestos a hacer la misma obra bajo iguales condiciones y por menos dinero."

Véanse, además: *C. Const. Corp. v. Mun. de Bayamón*, 115 D.P.R. 559, 563 (1984); *Cancel v. Municipio de San Juan*, 101 D.P.R. 296, 300 (1973), Op. Sec. Just. Núm.1962-84 de 18 de diciembre de 1962; Op. Sec. Just. Núm.1988-27 de 12 de septiembre de 1988.

prejuicio o parcialidad. *Morán Simó v. García Cristóbal*, 106 D.P.R. 155 (1977); *Rivera Pérez v. Cruz Corchado*, 119 D.P.R. 8 (1987); *Pérez v. Col. Cirujanos Dentistas de P.R.*, 131 D.P.R. 545 (1992); *Rodríguez Amadeo v. Santiago Torres*, 133 D.P.R. 785 (1993). En el caso de autos, sin embargo, procede que intervengamos con las determinaciones adoptadas por el tribunal de instancia, *ya que éstas, además de ser erróneas, atentan contra el esquema de política pública diseñado para la contratación del Gobierno.*

■ No tenemos duda alguna sobre el hecho de que las disposiciones que regulan el procedimiento de subasta pública establecen claramente la naturaleza única e individual de ésta. *Detrás de dichas disposiciones hay fuertes consideraciones de interés público que operan en beneficio de la protección del mecanismo de subasta, ya que se trata de un procedimiento singular mediante el cual el Gobierno y sus instrumentalidades logran la contratación de servicios de seguro.* Entendemos que de acuerdo a las disposiciones del Código de Seguros de Puerto Rico y su Reglamento, en lo referente al procedimiento de subastas, el tribunal de instancia erró al determinar que el Gobierno era un "cliente particular" de Oliveras.

■ Entiéndase que para llegar a dicha conclusión hemos tomado en consideración la importancia del esquema de subasta, el cual evita la corrupción gubernamental, protege al erario y garantiza la contratación de servicios de seguros de excelencia al más bajo postor. *De más está decir que todo el procedimiento de subasta contenido en la legislación y reglamentación mencionada constituye el derecho administrativamente vinculante, tanto para el asegurador o el agente que hace negocios con el Gobierno como para el asegurador y el agente en su relación interna.* Por lo tanto, la conclusión del tribunal de instancia a los efectos de que el Estado es un cliente particular o exclusivo de Oliveras atenta contra el procedimiento establecido por ley para la adjudicación de seguros públicos; *dicho foro no tomó en consideración que lo que se persigue mediante di-*

*cha legislación es proteger el patrimonio del Pueblo de Puerto Rico.*(28)

█ El esquema de subasta pública es preciso; el mismo deja claramente establecido el carácter individual y particular de cada subasta. Se trata de un proceso anual de contratación de seguros por parte del Gobierno, el cual conlleva la *competencia* en las subastas de aquellos licitadores que cualifiquen y acudan. *El Gobierno no puede ser cliente exclusivo de persona alguna en la contratación de seguros, ya que todos los licitadores tienen la expectativa de adquirir la buena pro.* Entendemos que el instrumento más idóneo que tiene el Gobierno para adquirir pólizas de seguro es el proceso de subastas. *Es nuestra obligación, en consecuencia, proteger la integridad del mismo y la libre competencia que éste garantiza.*

Con relación a la imposición —por parte del tribunal de instancia— del pago a Oliveras de seiscientos noventa y tres mil ochocientos ochenta y siete dólares con noventa y cinco centavos ($693,887.95), por concepto de comisiones en las pólizas emitidas por Universal a favor de la Administración de Servicios Generales, varios municipios, la Compañía de Desarrollo Industrial y el Estado Libre Asociado durante el periodo comprendido entre mayo de 1978 y 1983, entendemos que el tribunal a quo erró al otorgar dicha compensación a Oliveras. *Veamos.*

Oliveras alega que tiene derecho a cobrar comisiones por todas aquellas pólizas expedidas por Universal, luego de la terminación del contrato y de la participación directa de ésta en aquellas subastas por los seguros del Gobierno, donde obtuvo la buena pro. Para sostener dicha reclamación Oliveras se apoya en la Cl. 15 del contrato de agencia que dispone:

---

(28) La contratación de seguros por el Gobierno es una actividad de gran importancia. De acuerdo con información provista por el Secretario de Hacienda (en su solicitud para comparecer como *amicus curiae*), durante 1993, a través del Negociado de Seguros Públicos del Departamento de Hacienda, se tramitaron y se pagaron más de trescientos millones de dólares ($300,000,000) por primas de seguros.

> In the event of termination of this Agreement, the Agent having promptly accounted for and paid over premiums for which he may be liable, all of the Agent's records and use and control of expirations shall become the property of the Agent and be left in his undisputed possession; otherwise, the records pertaining to the Company's business and the use and control of expirations shall be vested in the Company. Caso Núm. RE-89-439, Apéndice 1, pág. 4.

Sostiene Oliveras que él obtuvo la propiedad de las "expiraciones" una vez terminado el contrato.[29] Las "expiraciones" no son otra cosa que la información que surge de los récord del agente y que contiene, por lo general: el nombre del asegurado, la fecha de la póliza, el día de expiración, el tipo de cubierta y sus términos, la prima, la propiedad cubierta y en algunos casos la copia de la póliza emitida. 4 *Couch on Insurance 2d (Ed. rev.)* Sec. 26A:260 (1984). Dicha información puede ser utilizada por el agente o la compañía para comunicarse con el asegurado antes de que expire la póliza; de esta forma se le da a éste la opción de renovar la póliza o llevar a cabo un cambio de compañía aseguradora. 2 *Harnett's Responsabilities of Insurance Agents and Brokers* Sec. 8.04 (1989). Dicho concepto de "expiraciones" ha sido adoptado por el American Agency

---

[29] Las "expiraciones" son definidas de la manera siguiente:

" 'Expirations' has acquired a definite and well-recognized meaning in insurance. The term 'expirations' has been defined as embodying records of an insurance agency by which the agent has available a copy of the policy issued or records containing the date of policy, name of the insured, date of expiration, amount of insurance, premiums, property covered, and terms of insurance, such information enabling the agency to contact the insured before expiration and furnishing it with information to secure another contract. Such information is of vital assistance to the agency in carrying on the insurance business and is recognized as a valuable asset in the nature of good will. It has also been defined as a copy of the policy issued to the insured which contains the date of the insurance, the name of the insured, the expiration, amount, premiums, property covered, and terms of insurance, and is valuable in that it furnishes leads for solicitation of expiring insurance and making renewals, and is property subject to sale for the benefit of creditors in a bankruptcy proceeding of the agency, but such sale does not embrace the usual collateral agreement of the agency not to solicit customers represented by the expirations, so that the referee has no authority to prevent the bankrupt agency from soliciting business of the former customers, notwithstanding the value of expirations is thereby reduced." (Escolios omitidos.) 4 *Couch on Insurance 2d (Ed. rev.)* Sec. 26A:260 (1984).

System.(³⁰) La aplicación de los "usos" del American Agency System, sin embargo, resultan incompatibles con nuestro ordenamiento establecido.

██ Como hemos señalado, el procedimiento de pública subasta es de suma importancia y está revestido de un alto interés público. Para garantizar su pureza se han establecido disposiciones legales y reglamentarias con relación a todo el procedimiento, especialmente en cuanto al requerimiento de las convocatorias, las cuales son publicadas y contienen toda la información necesaria para formular una cotización. Ya expresamos anteriormente que los pliegos de subasta son enviados a los licitadores antes de celebrarse cada subasta, y que los mismos contienen toda la información necesaria para la evaluación y suscripción del riesgo. *En consecuencia, forzosa resulta la conclusión de que la información utilizada por Universal, al hacer sus propuestas en las subastas, no es otra que aquella que le fue suministrada por el Gobierno en los pliegos y en las especificaciones de las convocatorias a las nuevas subastas y no los récord e información que Oliveras había utilizado en subastas anteriores.*

 Dicha información *no* es confidencial *ni* exclusiva ya que la misma se le provee a todos aquellos aseguradores incluidos en el Registro de Licitadores. *Precisamente, es de dicha información que los licitadores ajustan sus cotizaciones a las necesidades y requerimientos del Gobierno, asegurándoles la igualdad de condiciones a todos*

---

(³⁰) El American Agency System se refiere a los usos y costumbres en que se ha organizado el mercado de los seguros de propiedad y contingencia en Estados Unidos. Los elementos fundamentales son la figura del "agente independiente" y el concepto de las "expiraciones". Según el referido sistema, se reglamenta la relación entre agente y asegurador, de modo que se le prohíbe al asegurador hacer uso de la información del agente para solicitar negocio a los asegurados que produjo el agente independiente con sus gestiones de venta. Sin embargo, el American Agency System permite que, una vez terminado el contrato de agencia, el asegurador pueda comunicarle la terminación a sus asegurados. 2 *Harnett's Responsabilities of Insurance Agents and Brokers* Sec. 8.03 (1989); J.S. Geer, *Independent Insurance Agency Agreements and Termination of Agency: Antiquated Approach to the Modern Market*, 49 B.U. L. Rev. 286 (1969); *Fred Miller Co. v. Empire Fire & Marine Insurance Co.*, 503 F.2d 751, 754 (8vo Cir. 1974).

*éstos, sin que se beneficie aquel que obtuvo la buena pro anteriormente.* 26 L.P.R.A. sec. 204-6457, edición especial. De ninguna manera puede enmarcarse la contratación de seguros por parte del Gobierno dentro de las llamadas "expiraciones" ya que se violentaría uno de los pilares fundamentales detrás del procedimiento: la competencia limpia y libre de favoritismos.

A esos efectos, expresamos en *Hatton v. Mun. de Ponce,* 134 D.P.R. 1001, 1005 (1994), que:

> De entrada reiteramos que los preceptos legales que rigen las relaciones económicas entre entidades privadas y los municipios están revestidos de un gran interés público y aspiran promover una sana y recta administración pública. A fin de cuentas, "[l]a buena administración de un gobierno es una virtud de democracia, y parte de una buena administración implica llevar a cabo sus funciones como comprador con eficacia, honestidad y corrección para proteger los intereses y dineros del pueblo al cual dicho gobierno representa". *Mar-Mol Co., Inc. v. Adm. Servicios Gens.,* 126 D.P.R. 864, 871 (1990).

En resumen, cuando un asegurador comparece a las subastas directamente *no* tiene que hacer uso de ninguna información adquirida anteriormente; esto es así ya que cada subasta es un acto individual en el que se llevan a cabo convocatorias formales. Por lo antes expresado, y con el propósito de promover una sana y recta administración pública, *concluimos* que el derecho de Oliveras en el caso de autos *se limita* a cobrar comisiones sólo en aquellos casos en que intervino como representante de Universal y se le adjudicó la buena pro a ese asegurador. Una vez el contrato entre éstos venció, su derecho a las comisiones —sobre las pólizas obtenidas en nuevas subastas por Universal sin la intervención de éste— desapareció.

Por los *mismos* fundamentos, *no* procede siquiera discutir el planteamiento de Oliveras con relación a su supuesto "derecho" a recibir las comisiones provenientes de las renovaciones de pólizas.

C. Plantea Universal como error que se le otorgara a

Oliveras una cuantía por concepto de "comisiones contingentes" (*profit sharing*). Dicho error *no* fue cometido.

De acuerdo con la sentencia del tribunal de instancia, se le impuso a Universal el pago de "comisiones contingentes" (*profit sharing*) para 1976, 1977, 1978 y para los negocios de los municipios, por un total de doscientos once mil novecientos cincuenta y cuatro dólares con catorce centavos ($211,954.14). El contrato otorgado por las partes el 25 de febrero de 1976 establecía la concesión de una "comisión contingente" (*profit sharing*) de un diez por ciento (10%) sobre los beneficios netos a ser computados el 31 de diciembre de cada año. Dicha comisión debía ser computada sumando la primas netas ganadas (*net premiums earned*), suma a la que se le descontaría: (1) las pérdidas pagadas y los gastos incurridos por pérdidas pagadas (*losses paid and loss expense paid*); (2) las pérdidas pendientes de pago y los gastos relativos a esas pérdidas pendientes de pago (*outstanding losses and outstanding loss expense*); (3) el veinte por ciento (20%) por concepto de gastos administrativos de Universal a ser computados sobre las primas netas ganadas (*insurers administrative expense of 20% of item (1) income*), y (4) cualquier déficit proveniente de años anteriores (*deficit, if any, carried forward from previous year or years accounts*). *En otras palabras*, del total de las primas, una vez se realizaran los descuentos descritos anteriormente, se obtienen las ganancias netas anuales, de las cuales Universal se obligó a pagarle a Oliveras el diez por ciento (10%).

■ *Por otro lado*, para calcular las "comisiones contingentes" (*profit sharing*) *resultaba necesario* que se especificara y se presentara prueba sobre las pérdidas sufridas por Universal, a saber, las pérdidas pagadas y los gastos relacionados con las primas, las pérdidas pendientes de pago y los gastos relacionados, los gastos administrativos de ésta y la pérdida atrasada de años anteriores, si alguna. *De acuerdo con la sentencia del tribunal de instancia, dicha prueba jamás fue presentada por Universal.* La Regla

10(A) de Evidencia, 32 L.P.R.A. Ap. IV, establece que: "El peso de la prueba recae sobre la parte que resultaría vencida de no presentarse evidencia por ninguna de las partes." A tenor con lo expresado anteriormente, forzoso es concluir que era la parte demandada la que tenía el peso de probar dicho elemento, de modo que el tribunal de instancia hubiera estado en condiciones de calcular correctamente la suma correspondiente a la "comisión contingente" (*profit sharing*). Por lo expuesto anteriormente concluimos que *no* se cometió el error señalado.

D. Plantea, además, Universal la comisión de error respecto a la ausencia de pronunciamiento, por parte del tribunal de instancia en cuanto a la reconvención instada por ésta, a pesar de haberse presentado prueba al efecto.[31] De igual modo, Universal plantea que dicho tribunal erró al concederle a Oliveras el derecho de recobrar la suma de ciertas comisiones debidas y no pagadas por Universal a aquél, negándosele a ésta el derecho de nivelación. De proceder esta alegación tendríamos ante nosotros la figura de la "compensación".[32] *Dichos errores fueron cometidos* por cuanto el tribunal de instancia no hizo pronunciamiento alguno al respecto. Procede, en consecuencia, devolver el caso al tribunal de instancia para que éste *resuelva* la controversia planteada en la reconvención.

E. Universal cuestiona la actuación del tribunal de instancia al imponerle el pago de veinte mil dólares ($20,000) por concepto de honorarios de abogado. *Entendemos que dicho error fue cometido.*

██ La Regla 44.1(d) de Procedimiento Civil, 32 L.P.R.A. Ap. III, dispone, en lo pertinente, que:

(d) *Honorarios de abogado.* En caso que cualquier parte o su

---

[31] Universal alega en la reconvención que Oliveras retuvo primas en su poder que ascienden a la suma de setecientos mil dólares ($700,000).

[32] De acuerdo con el Art. 1149 del Código Civil, 31 L.P.R.A. sec. 3221, "[t]endrá lugar la compensación cuando dos personas, por derecho propio, sean recíprocamente acreedoras y deudoras la una de la otra".

abogado haya procedido con temeridad o frivolidad, el tribunal deberá imponerle en su sentencia al responsable el pago de una suma por concepto de honorarios de abogado que el tribunal entienda correspondan a tal conducta.

En el caso *Fernández v. San Juan Cement Co., Inc.*, 118 D.P.R. 713 (1987), nos expresamos en torno a los honorarios de abogado y su procedencia. Con relación a éstos establecimos que:

> La imposición de honorarios de abogado es discrecional, *Raluan Corp. v. Feliciano*, 111 D.P.R. 598 (1981), pero la Regla 44.1(d) de Procedimiento Civil es clara en el sentido de que cuando una parte ha procedido con temeridad, el tribunal *deberá* imponerle en su sentencia el pago de una suma por concepto de honorarios de abogado. Determinada la existencia de temeridad, la condena de honorarios es imperativa. *Montañez Cruz v. Metropolitan Cons. Corp.*, 87 D.P.R. 38 (1962); *Ortiz v. Martorell*, 80 D.P.R. 544 (1958); *Castro v. Payco, Inc.*, 75 D.P.R. 63 (1953); *Font v. Pastrana*, 73 D.P.R. 247 (1952); *Hernández v. Caraballo*, 74 D.P.R. 29 (1952); *Stella v. Bonilla*, 65 D.P.R. 542 (1946).
>
> . . . . . . . .
>
> El concepto "temeridad" no está expresamente definido por la Regla 44.1(d) de Procedimiento Civil.
> Un comentarista ha dicho que la "temeridad es una actitud que se proyecta sobre el procedimiento y que afecta el buen funcionamiento y la administración de la justicia. También sujeta al litigante inocente a la ordalía del proceso judicial y lo expone a gastos innecesarios y a la contratación de servicios profesionales, incluyendo abogados, con el gravamen a veces exhorbitante para su peculio". H. Sánchez, *Rebelde Sin Costas*, 4(2) Boletín Judicial 14 (1982). *Fernández v. San Juan Cement Co., Inc.*, ante, págs. 717–718.

El concepto "temeridad" implica una "[a]ctitud de quien afirma hechos o se conduce sin fundamento o motivo, con conciencia de la propia sinrazón". E.J. Couture, *Vocabulario Jurídico*, Buenos Aires, Eds. Depalma, 1976, págs. 556. Dicho concepto ha sido ampliamente definido en nuestra jurisprudencia, la cual ha considerado la "temeridad" como toda aquella conducta que *haga necesario* un pleito que se pudo evitar, que lo *prolongue innecesariamente* o requiera a la otra parte efectuar gestiones innecesarias. *Torres Ortiz v. E.L.A.*, 136 D.P.R. 556 (1994);

*Elba A.B.M. v. U.P.R.*, 125 D.P.R. 294 (1990); *Hawayek v. A.F.F.*, 123 D.P.R. 526 (1989); *Fernández v. San Juan Cement Co., Inc.*, ante, págs. 718–719.

La imposición de honorarios de abogado tiene el propósito de "castigar a aquel litigante perdidoso que, por su terquedad, obstinación, frivolidad o insistencia —en actitud desprovista de fundamentos— obliga a la parte contraria a asumir innecesariamente las molestias, gastos e inconvenientes de un pleito". *Santos Bermúdez v. Texaco P.R., Inc.*, 123 D.P.R. 351, 356 (1989). Véase *Fernández v. San Juan Cement Co., Inc.*, ante.

En *Santos Bermúdez v. Texaco P.R., Inc.*, ante, quedó establecido que no existe temeridad cuando lo que se plantea ante el tribunal de instancia son planteamientos complejos y novedosos que no han sido resueltos en nuestra jurisdicción.[33] Tampoco existe temeridad en aquellos casos en que el litigante actúa de acuerdo a la apreciación errónea de una cuestión de derecho y no hay precedentes establecidos sobre la cuestión, *Cabanillas v. Gelpí*, 65 D.P.R. 945, 949 (1946), o cuando existe alguna desavenencia honesta en cuanto a quién pertenece el derecho aplicable a los hechos del caso. *Santos Bermúdez v. Texaco P.R., Inc.*, ante; *Santaella Negrón v. Licari*, 83 D.P.R. 887, 903–904 (1961).

En el caso de autos, el tribunal de instancia *no* ejerció adecuadamente su discreción al condenar a Universal al pago de honorarios de abogado. Sin lugar a dudas, este caso plantea cuestiones novedosas que no habían sido resueltas por este Tribunal anteriormente. Entendemos que Universal no incurrió en conducta que pueda ser considerada como temeraria; todo lo contrario, su actuación en el

---

[33] Con relación a este planteamiento véanse, además: *García Larrinua v. Lichtig*, 118 D.P.R. 120 (1986); *Marina Ind., Inc. v. Brown Boveri Corp.*, 114 D.P.R. 64, 91 (1983); *M. Quilichini Sucrs., Inc. v. Villa Inv. Corp.*, 112 D.P.R. 322, 328 (1982); *Rodríguez v. John Hancock Mutual Life*, 110 D.P.R. 1, 8 (1980); *Morales Garay v. Roldán Coss*, 110 D.P.R. 701 (1981); *Caloca v. C.I.A.A.*, 108 D.P.R. 164, 173 (1978).

pleito en todo momento ha sido honesta y fundamentada en una controversia real. Al amparo de la normativa anteriormente expresada concluimos que *no proceden los honorarios de abogado impuestos por el tribunal de instancia a Universal.*

*Se dictará sentencia de conformidad.*

El Juez Asociado Señor Fuster Berlingeri concurrió con el resultado sin opinión escrita.